UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CAPITAL VENTURES INTERNATIONAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UBS SECURITIES LLC, | ) | Civil Action No. 11-11937-DJC |
| UBS REAL ESTATE SECURITIES, INC., and | ) | |
| MORTGAGE ASSET SECURITIZATION | ) | |
| TRANSACTIONS,  INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>MEMORANDUM AND ORDER</u>

CASPER, J.                                                          September 28, 2012

## I.      Introduction

Plaintiff Capital Ventures International ("Capital Ventures") purchased residential mortgage-backed security ("RMBS") pass-through certificates (the "Certificates") from UBS Securities LLC ("UBS Securities") between 2004 and 2006.  Compl., D. 16 at ¶¶ 3, 9.  Capital Ventures brings this action against UBS Securities, UBS Real Estate Securities, Inc. ("UBS Real Estate") and Mortgage Asset Securitization Transactions, Inc. ("MASTR") (collectively, the "Defendants") alleging violations of sections 410(a) and (b) of the Massachusetts Uniform Securities Act ("MUSA") arising from material misstatements or omissions regarding the credit quality of the Certificates in registration statements, prospectuses, prospectus supplements and term sheets (the "Offering Materials").  The Defendants have moved to dismiss the complaint

under Fed. R. Civ. P. 12(b)(6).  For the reasons set forth below, the Defendants' motion is DENIED in part and GRANTED in part.

## II.     Standard of Review

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court will dismiss a complaint or a claim that fails to plead "enough facts to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  To state a plausible claim, a complaint need not contain detailed factual allegations, but it must recite facts sufficient to at least "raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 555; see San Geronimo Caribe Project, Inc. v. Acevedo-Vila, 687 F.3d 465, 471 (1st Cir. 2012).  A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Id. (quoting Twombly, 550 U.S. at 557) (alteration in original).  At bottom, a complaint must contain sufficient factual matter that, accepted as true, would allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

## III.    Factual Allegations and Procedural History

Capital Ventures purchased over $109 million of RMBS Certificates in six transactions (the "Offerings") from UBS Securities between 2004 and 2006.  Compl., D. 16 at ¶ 3.  The Certificates represent interests in a pool of mortgage loans.  Compl., D. 16 at ¶ 23.  All of the Certificates were created in an essentially identical multi-step securitization process.  The depositor acquires an inventory of mortgages from a sponsor, which has either originated the

mortgages itself by giving loans to borrowers or acquired them from third-party mortgage originators.  Compl., D. 16 at ¶ 24.  Here, the principal originators responsible for the loans underlying the Certificates were American Home Mortgage Investment Corporation ("American Home"), Countrywide Home Loans, Inc. ("Countrywide"), Wells Fargo Bank, NA ("Wells Fargo") and First Horizon Home Loan Corporation ("First Horizon") or affiliates of same.  Compl., D. 16 at ¶ 14.  Upon acquisition of the pool of mortgages, the depositor transfers the loan pool to an "issuing trust."  Compl., D. 16 at ¶ 26.  The depositor then "securitize[d] the loan pool in the issuing trust so that the rights to the cash flows from the pool can be sold to investors."  Compl., D. 16 at ¶ 26.  The securitization transactions were structured so that the risk of loss is divided among different levels of investment called "tranches" (or classes).  Compl., D. 16 at ¶ 26.  "Tranches consist of multiple series of related securities offered as part of the same offering, each with a different level of risk and reward."  Compl., D. 16 at ¶ 26.  Once the tranches are established, the trust issues certificates to the depositor, who used one or more underwriters to offer and sell the certificates to investors.  Compl., D. 16 at ¶ 27.  For the MARM 2004-13 and MARM 2005-8 Offerings at issue here, UBS Real Estate served as the sponsor and MASTR served as the depositor.  Compl., D. 16 at ¶¶ 10–11.  UBS Securities served as underwriter for all six of the Offerings at issue and was the entity from whom Capital Ventures purchased the Certificates.  Compl., D. 16 at ¶ 9.

The collateral pool for each securitization usually contained thousands of mortgages.  Compl., D. 16 at ¶ 30.  Information about those mortgages was included in the "loan files" that the mortgage originators developed while making the loans.  Compl., D. 16 at ¶ 28.  Investors, like Capital Ventures, were not given access to the loan files and must rely on the representations made in the Offering Materials about the quality and nature of the loans that form the security for

their Certificates.  Compl., D. 16 at ¶ 31.  Capital Ventures alleges that the Offering Materials misstated or omitted certain material facts regarding underwriting standards and practices, owner-occupancy statistics, loan-to-value ratios and the credit ratings process.

### A.   Underwriting Standards and Practices

The Offering Materials associated with each of the Certificates described the underwriting guidelines employed to evaluate the mortgages.  Compl., D. 16 at ¶ 44.  The Offering Materials represented that exceptions to the underwriting guidelines would only be used on a case-by-case basis when the loan file justified the use of such an exception.  Compl., D. 16 at ¶ 48.  Capital Ventures alleges that the mortgages supporting the Certificates did not comply with the underwriting standards the Offering Materials described because those standards were "systematically ignored."  Compl., D. 16 at ¶ 50.

### B.   Owner-Occupancy Statistics

The Offering Materials associated with each of the Certificates reported statistics concerning the proportion of loans secured by owner-occupied properties in each supporting mortgage pool.  Compl., D. 16 at ¶ 53.  Capital Ventures alleges that these representations were false and misleading because a much lower percentage of the loans were backed by owner-occupied properties than was represented.  Compl., D. 16 at ¶ 54.

### C.   Loan-To-Value Ratios

The loan-to-value ("LTV") ratio is the ratio of the balance of the mortgage loan to the value of the mortgaged property when the loan was made.  Compl., D. 16 at ¶ 55.  The Offering Materials associated with each of the Certificates reported statistics concerning the LTV ratios of the mortgages supporting the Certificates.  Compl., D. 16 at ¶ 56.  The Offering Materials also made representations regarding the appraisal process that determined the value of the mortgaged

property.  Compl., D. 16 at ¶ 57.  Capital Ventures alleges that the Defendants, originators and appraisers knew that the appraisal process was being manipulated and, therefore, the LTV ratios and the representations regarding the appraisal process used to arrive at the LTV ratios were false and misleading.  Compl., D. 16 at ¶ 59.

>	D.	**Credit Ratings Process**

The Offering Materials reported ratings for each tranche (or class) of the Certificates that were based on the analyses conducted by the credit rating agencies.  Compl., D. 16 at ¶ 60.  The Offering Materials represented that in arriving at the given ratings, the rating agencies conducted an analysis "designed to assess the likelihood of delinquencies and defaults in the supporting mortgage pools."  Compl., D. 16 at ¶ 61.  Capital Ventures alleges that the ratings were based on false and misleading data.  Compl., D. 16 at ¶ 63.  All of Capital Ventures's Certificates have been downgraded to "junk-bond" ratings by at least one of the rating agencies, with all but one being rated as "junk" by both agencies that provide ratings on the Certificates.  Compl., D. 16 at ¶ 69.

Based on these alleged misrepresentations and omissions, Capital Ventures filed the instant action against the Defendants on November 1, 2011.  Compl., D. 1, 16.  On January 10, 2012, the Defendants moved to dismiss Capital Ventures's complaint pursuant to Fed. R. Civ. P. 12(b)(6).  Def. Mot., D. 13.  After a hearing on the Defendants' motion on July 27, 2012, the Court took the matter under advisement.

## IV.	Discussion

Capital Ventures's claims arise under the MUSA, which imposes civil liability on any person who "offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of

the circumstances under which they are made, not misleading."   Mass. Gen. L. c. 110A, § 410(a)(2).   The MUSA also imposes joint and several liability on any person who "directly or indirectly controls a seller liable under subsection (a), every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions."   Id. § 410(b). Section 410 of the MUSA is modeled after section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2), and courts have interpreted MUSA in conformity with the federal act. Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 50 (2004); Fenoglio v. Augat, Inc., 50 F. Supp. 2d 46, 59 (D. Mass. 1999) (noting that MUSA section 410(a)(2) is "substantially similar to the federal securities laws and therefore decisions construing the federal statutory language are applicable to the state statute as well" (quoting Adams v. Hyannis Harborview, Inc., 838 F. Supp. 676, 684 n.9 (D. Mass. 1993))), aff'd, 254 F.3d 368 (1st Cir. 2001).   Capital Ventures alleges that all the Defendants and the trusts[1] are primarily liable under section 410(a)(2) and that UBS Real Estate and MASTR are liable as "control persons" under section 410(b) for their role in the MARM Offerings.  Compl., D. 16 at ¶¶ 189, 198.

The Defendants have moved to dismiss the complaint, arguing that:  (1) Capital Ventures has failed to plead any actionable misstatement or omission in the Offering Materials with regard to the underwriting guidelines, owner-occupancy statistics, appraisals and LTV ratios and credit ratings; (2) Capital Ventures has failed to allege that any misstatements or omissions were material; (3) the claims are time-barred by the applicable four-year statute of limitations period; (4) UBS Real Estate and MASTR cannot be primarily liable under MUSA section 410(a) because they are not offerors or sellers; and (5) the "control person" claims against UBS Real Estate and MASTR should be dismissed because Capital Ventures failed to allege adequately that they exercised control over an alleged primary violator.  Def. Mot., D. 14 at 8–10.

---

[1] The trusts are not named as defendants.

A.   **Failure to Plead Misstatements or Omissions**

    *1.    Underwriting Guidelines*

Capital Ventures alleges that the Offering Materials contained misrepresentations regarding the underwriting guidelines used to generate loans. Compl., D. 16 at ¶¶ 44–50. Specifically, it alleges that the Defendants made certain representations describing the underwriting guidelines employed to evaluate the loans, such as "[a]ll the Mortgage Loans will have been originated or acquired by Countrywide Home Loans and Countrywide Bank in accordance with their respective credit, appraisal, and underwriting processes." Compl., D. 16 at ¶ 44 (quoting CWALT 2006-OA10 P.S. at S-87). The "purported goal of the guidelines" was to "evaluate the prospective borrower's credit standing and repayment ability and adequacy of the mortgage property as collateral." Compl., D. 16 at ¶ 46 (quoting CWALT 2006-OA10 P.S. at S-88). Capital Ventures alleges that the Offering Materials provided "details regarding the guidelines applied to the Mortgage Loans," such as "a prospective borrower must generally demonstrate that the ratio of the borrower's monthly housing expenses . . . to the borrower's monthly gross income and the ratio of total monthly debt to the monthly gross income (the 'debt-to-income' ratios) are within acceptable limits." Compl., D. 16 at ¶ 47 (quoting CWALT 2006-OA10 P.S. at S-88). Even when "exceptions" to the underwriting guidelines were made, "the Offering Materials represent[ed] that such 'exceptions' would only be used on a case-by-case basis when the loan file justified the use of such an exception." Compl., D. 16 at ¶ 48. Capital Ventures further alleges that these representations were false because the originators "systematically ignored" the underwriting standards by, for example, ignoring the borrowers' actual repayment ability and issuing loans on the basis of unjustified exceptions to the standards. Compl., D. 16 at ¶ 50.

Capital Ventures provides various sources of support for these allegations, namely:  (1) that there was a general incentive in the mortgage securitization industry to abandon underwriting guidelines, Compl., D. 16 at ¶¶ 37–43; (2) that the loans underlying the Certificates experienced high percentages of defaults and delinquencies that, according to Capital Ventures, can be explained by "faulty underwriting," Compl., D. 16 at ¶¶ 64–65, 70–73; (3) that a third-party diligence firm, Clayton Holdings, Inc., reviewed the Defendants' loan files for, among other things, "adherence to seller-credit underwriting guidelines," and found that "a startlingly high percentage of loans reviewed . . . were defective, but were nonetheless included by Defendants in loan pools sold to investors such as Capital Ventures," Compl., D. 16 at ¶¶ 104–112; and (4) that a subsequent loan-level analysis of the risk factors of all of the loans backing the AHMA 2006-2, CWALT 2005-74T1, CWALT 2006-OA10 and CWMBS 2006-OA5 Offerings and 1,600 of the loans backing the MARM 2004-13 and MARM 2005-8 Offerings constitutes "powerful evidence that the originators failed to adhere to their stated underwriting guidelines."  Compl., D. 16 at ¶¶ 74–98, 114.  Capital Ventures also cites statements from employees of the originators, third parties, confidential witnesses and internal documents to support its claim that the originators systematically disregarded its underwriting standards when issuing mortgages.  Compl., D. 16 at ¶¶ 116–177.

The Defendants argue that these allegations are insufficient to state a claim.  First, they contend that the "offering documents disclosed that loans underlying the Certificates would not always be originated in accordance with stated underwriting guidelines, but rather that originators would make exceptions thereto."  Def. Mot., D. 14 at 19.  That is, the Offering Materials disclosed that originators issued some loans with little or no documentation of a borrower's income, assets or employment and often issued loans based on a borrower's ability to

make the initial payments and that, as a result, the loans might experience higher rates of delinquencies and foreclosures.  Def. Mot., D. 14 at 19–20.  Warnings in the Offering Materials state, for example, that "[s]ome of the mortgage loans may have been . . . ineligible for purchase by Fannie Mae or Freddie Mac due to either credit characteristics of the related mortgagor or documentation standards in connection with the underwriting of the related mortgage loan that do not meet the Fannie Mae or Freddie Mac underwriting guidelines for 'A' credit mortgagors," see, e.g., D. 15-1 at 18; "exceptions to the Originator's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception," see, e.g., D. 15-1 at 29; and that some of the loans did not require the borrower "to provide any information regarding employment income, assets required to close or both."  See, e.g., D. 15-1 at 27.

However, the First Circuit has considered a similar argument in regard to similar disclosures as sufficient to state a claim:

> Neither being "less stringent" than Fannie Mae nor saying that exceptions occur when borrowers demonstrate other "compensating factors" reveals what plaintiffs allege, namely, a wholesale abandonment of underwriting standards.  That is true too of the warning that less verification may be employed for "certain limited documentation programs designed to streamline the loan underwriting process."  Plaintiffs' allegation of wholesale abandonment may not be proved, but—if accepted at this stage—it is enough to defeat dismissal.

Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp. (Nomura), 632 F.3d 762, 773 (1st Cir. 2011).  The allegations here, and the basis for same, are substantially similar to those in Nomura.  In Nomura, the plaintiffs likewise alleged a wholesale abandonment of underwriting standards and the warnings in the offering documents at issue, stated, for example, that the "underwriting standards . . . typically differ from, and are . . . . generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac"; "certain

exceptions to the underwriting standards . . . are made in the event that compensating factors are determined by a prospective borrower"; and the originator "originates or purchases loans that have been originated under certain limited documentation programs [that] may not require income, employment or asset verification." Id. Accordingly, the disclosures relied upon by the Defendants do not vitiate the sufficiency of Capital Ventures' claim for pleading purposes. See, e.g., Mass. Mut. Life Ins. Co. v. Residential Funding Co. (Mass. Mutual), 843 F. Supp. 2d 191, 202 (D. Mass. 2012) (rejecting the defendants' argument that disclosing in the offering documents that originators "could and would make exceptions to their underwriting guidelines" and "used no-documentation programs that required little or no documentary verification from borrowers and that, as a result, the loans might experience higher rates of delinquencies and foreclosures" warranted dismissing the plaintiff's section 410(a) claim).

Second, the Defendants argue that the Offering Materials did not make any absolute representations regarding the underwriting standards. Def. Mot., D. 14 at 29 (arguing "Plaintiff's allegations also fail because they are based on the flawed premise that the offering documents represented that every single loan would comport with the loan information and underwriting guidelines provided. Defendants made no such promise"). For example, "the offering documents provided that where an originator breached its 'representations and warranties with respect to [a] loan made in the transaction agreements . . . [t]he originator [had to] correct or cure any such defect' or provide 'a substitute mortgage loan.'" Def. Mot., D. 14 at 29 (quoting AHMAT 2006-2 P.S. at S-8) (alteration in original).

In support of this contention, the Defendants cite Lone Star Fund V (US), L.P. v. Barclays Bank PLC, 594 F.3d 383, 389–90 (5th Cir. 2010), in which the defendant represented that mortgage pools would not contain any delinquent mortgages, but if some mortgages were

delinquent, the "sole remedy" would be for the defendant to repurchase them or substitute performing mortgages.  Id. at 389.  The Fifth Circuit held that, in light of a "repurchase or substitute" provision, the defendant did not represent that the mortgage pools "were absolutely free from delinquent loans" and, because plaintiff did not allege that defendant failed to repurchase or substitute the delinquent mortgages, the defendant made no actionable misrepresentations even though the mortgage pools contained delinquent mortgages.  Id. However, as several courts have articulated, this case is distinguishable because its holding "is limited to cases involving a small number of correctable mistakes, and courts have refused to allow such clauses to defeat claims of the type of widespread misrepresentation alleged here." Mass. Mutual, 843 F. Supp. 2d at 201 n.7; see Emps.' Ret. Sys. of the Gov't of the V. I. v. J.P. Morgan Chase & Co., 804 F. Supp. 2d 141, 155 (S.D.N.Y. 2011) (distinguishing Loan Star because there "the plaintiffs 'pointed to a limited number of loans that failed to conform to the representation regarding their default status'; here, by contrast the plaintiffs claim 'widespread misrepresentations regarding the nature of the underwriting [and appraisal] practices described in the offering documents'" (quoting City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc., No. CV 08–1418, 2010 WL 6617866, at *7 (E.D.N.Y. Dec. 23, 2010))); Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc., Nos. 11-2340-RDR, 11-2649-RDR, 2012 WL 3028803, at *32 (D. Kan. July 25, 2012) (same).

Finally, the Defendants state that "[v]ery few allegations in Plaintiff's Complaint relate to the specific loan originators and none relate to the specific loans at issue" to suggest that same are insufficient to state a claim.  Def. Mot., D. 14 at 17.  But the First Circuit in Nomura considered and rejected a similar argument, concluding that it was sufficient for the plaintiff to make specific allegations regarding such underwriting practices and to link same to the specific

originator(s) that supplied the mortgages at issue.   <u>Nomura</u>, 632 F.3d at 773–74.   Like the

plaintiffs in <u>Nomura</u>, Capital Ventures has alleged specific practices of abandoning guidelines

and has linked such practices to American Home, Countrywide, Wells Fargo and First Horizon,

the principal originators of the Certificates at issue here.   <u>Compare</u>, <u>e.g.</u>, Compl., D. 16 at ¶ 162

(alleging that "Mario Taylor, a credit manager [at Wells Fargo] from June 2006 to February

2008, submitted an affidavit stating that . . . Wells Fargo had a 'loan optimizer' that enabled

managers to know exactly what data needed to be submitted to generate a loan approval"), <u>with</u>

Consolidated Amended Complaint at ¶ 87, <u>Nomura</u> 632 F.3d 762 (No. 08-cv-10446) (alleging

that "[w]hen FNBN received a loan application from a broker, the first step was to 'scrub' the

application. . . . Loan scrubbing referred to the practice of finding and eliminating information

from the loan package that would disqualify the potential borrower from FNBN's loan programs.

. . . FNBN Loan Coordinators were fired for failing to scrub disqualifying information from a

loan package" (emphasis omitted)); <u>see also</u> Compl., D. 16 at ¶¶ 114–177.   Capital Ventures has

also alleged a significant deterioration of the credit ratings after the sales of the Certificates.   <u>See</u>

Compl., D. 16 at ¶¶ 66–69.[2]   Therefore, the allegations at issue here clear the pleading hurdle.

### 2.    *Owner-Occupancy Statistics*

Capital Ventures alleges that the Offering Materials contained misrepresentations

regarding the percentage of borrowers who would be occupying the mortgaged properties

because "a far greater percentage of the loans underlying the Certificates than represented were

given to borrowers who lived elsewhere."   Compl., D. 16 at ¶ 2(ii).   Capital Ventures alleges that

the owner-occupancy rates for each securitization were overstated by between 11.56% and

---

[2] The Defendants also argue that "increases in loan delinquencies and defaults do not plausibly
suggest that any loan originator abandoned its guidelines.   To the contrary, they only serve to
validate the offering documents' disclosures about the riskiness of the loans and their anticipated
poor performance during a recession."   Def. Mot., D. 14 at 14.   However, this is a "question of
fact that cannot be resolved on a motion to dismiss."   <u>Mass. Mutual</u>, 843 F. Supp. 2d at 202.

16.96%. Compl., D. 16 at ¶ 85 (presenting table of rate discrepancies). As part of its loan-level

analysis of the mortgages underlying the Certificates, Capital Ventures used a number of tests to

determine whether the owner-occupancy statistics reported in the Offering Materials were

accurate. Specifically, it examined (1) whether a borrower's property tax bill was being mailed

to the mortgaged property; (2) whether the borrower claimed certain tax exemptions that depend

on the borrower living at the mortgaged property; and (3) whether the address of the mortgaged

property was reflected in the borrower's credit, property and lien records as the mailing address.

Compl., D. 16 at ¶¶ 80–83. Capital Ventures contends that its "loan-level analysis of true owner-

occupancy rates on the Mortgage Loans underlying the Offerings" shows that the specific owner-

occupancy statistics were false and misleading. Compl., D. 16 at ¶¶ 85–86. The Defendants

contend that these allegations are insufficient to establish a false or misleading statement because

some of the Offering Materials did not report the owner-occupancy rates as established fact, but

rather made clear that they were borrower-reported.[3] Def. Mot., D. 14 at 21, 28; see Mass.

Mutual, 843 F. Supp. 2d at 205 (noting that "[b]ecause the offering documents explicitly stated

that all occupancy rates were based only on borrowers' representations and because Plaintiff

---

[3]     Defendants argue that Capital Ventures' appraisal, LTV ratio and owner-occupancy
claims are subject to–but cannot meet–Fed. R. Civ. P. 9(b)'s heightened pleading requirement for
averments of fraud, because they allege knowing misstatements. D. 18 at 10–13; see Shaw v.
Digital Equip. Corp., 82 F.3d 1194, 1223 (1st Cir. 1996) (securities complaints without a scienter
element must still comply with Rule 9(b) if they sound in fraud), superseded by statute on other
grounds, 15 U.S.C. § 78u-4(b)(2). But more is required to trigger Rule 9(b). In Shaw, the First
Circuit held that allegations that the defendant knew but failed to disclose information "cannot be
thought to constitute 'averments of fraud,' absent any claim of scienter and reliance. Otherwise,
any allegation of nondisclosure of material information would be transformed into a claim of
fraud for purposes of Rule 9(b)." Id.; see also In re No. Nine Visual Tech. Corp. Sec. Litig., 51
F. Supp. 2d 1, 12 (D. Mass. 1999) (noting that "courts must ensure that the former truly do
'sound in fraud' before the heightened pleading standard . . . attaches"). Because Capital
Ventures does not allege more than knowledge on Defendants' part, Rule 9(b) does not apply
here. See Lenartz v. Am. Superconductor Corp., No. 11-10582-WGY, 2012 WL 3039735, at
*19-20 (D. Mass. July 26, 2012) (allegations that defendants "knew or should have known" of
misstatements did not trigger Rule 9(b)). Accordingly, the Court will examine the claims under
Fed. R. Civ. P. 8(a).

does not allege that Defendants falsely reported the borrowers' representations, the documents relied on by Plaintiff contained no misstatements or omissions concerning owner-occupancy rates as a matter of law"); <u>Footbridge Ltd. v. Countrywide Home Loans, Inc.</u>, No. 09 Civ. 4050 (PKC), 2010 WL 3790810, at *9 (S.D.N.Y. Sept. 28, 2010).  For example, the CWALT 2005-74T1 prospectus supplement contains a chart of the owner-occupancy statistics and a footnote that the data was "[b]ased upon representations of the related borrowers at the time of origination."  D. 15-2 at 17; <u>see</u> D. 15-3 at 39 (same disclosure for CWALT 2006-OA10), D. 15-5 at 37 (same disclosure for CWHL 2006-OA5).

Capital Ventures makes a number of responses to these arguments.  First, it notes that three of the Offerings (AHMAT 2006-2, MARM 2004-13 and MARM 2005-8) included no disclosure related to owner-occupancy rates. Pl. Opp., D. 17 at 31.  Second, it points out that the other Offerings (CWALT 2005-74T1, CWALT 2006-OA10, and CWHL 2006-OA5), which did include a disclosure specific to owner-occupancy, nevertheless failed to warn of borrower fraud. Pl. Opp., D. 17 at 31–32.  Thus, Capital Ventures contends, these disclosures are distinguishable from those in <u>Mass. Mutual</u>.  Pl. Opp., D. 17 at 31–32.  Third, Capital Ventures attempts to distinguish <u>Mass. Mutual</u> on the additional ground that, as to the CWALT 2005-74T1, CWALT 2006-OA10 and CWHL 2006-OA5 Offerings, the complaint "alleges that the statistics were <u>knowingly</u> falsified [by the borrowers]—an allegation not made in <u>Mass[. ]Mutual</u>."  Pl. Opp., D. 17 at 32 (citing Compl., D. 16 at ¶ 87).

Capital Ventures's first point is well-taken.  As to AHMAT 2006-2, MARM 2004-13 and MARM 2005-8, the Defendants identify no occupancy-specific disclosure that could have put Capital Ventures on notice of the potential unreliability of the reported occupancy rates; accordingly, the Defendants are not insulated from liability for those alleged misstatements.

As to the Offering Materials that contained disclosures that the owner-occupancy rates were based only on borrowers' representations, Capital Ventures' other arguments distinguishing Mass. Mutual pose a closer call for this Court, but are also persuasive.  The Mass. Mutual court, in considering whether such disclosures precluded liability, noted that the disclosures in that case also "explicitly disclosed the possibility of borrower misrepresentation or fraud," id. at 205, which the disclosures here do not.  Compare e.g., Prospectus at 12, Mass. Mutual, 843 F. Supp. 2d 191 (No. 11-cv-3044-MAP), ECF No. 19-5 ("Fraud committed in the origination process may increase delinquencies and defaults on the mortgage loans.  For example, a borrower may present fraudulent documentation to a lender during the mortgage loan underwriting process, which may enable the borrower to qualify for a higher balance or lower interest rate mortgage loan than the borrower would otherwise qualify for"), with CWALT2005-74T1 Prospectus, D. 15-2 at 30 ("[A] credit enhancement may not cover all potential sources of loss.  For example, a credit enhancement may or may not cover fraud or negligence by a loan originator or other parties").  Furthermore, unlike the plaintiff in Mass. Mutual, Capital Ventures alleges that the Defendants passed on information that they knew was false.  Compl., D. 16 at ¶ 87.  In light of the lack of specific disclosures regarding the risk of borrower misrepresentation and the allegation that the "Defendants . . . knew the borrowers were misrepresenting their intent to live at the property," Compl., D. 16 at ¶ 87, the Court is persuaded that the Defendants "cannot simply claim that [they] blindly reported information given to [them] by third parties and thereby avoid liability for inaccuracies that made their way into the offering materials."  Fed. Hous. Fin. Agency v. UBS Americas, Inc., No. 11 Civ. 5201 (DLC), 2012 WL 1570856, at *17 (S.D.N.Y. May 4, 2012).  Accordingly, Capital Ventures's claims that the Offering Materials overstated the percentage of owner-occupied properties as to all Offerings, including the Offerings that were accompanied by

disclosures stating the source of the information, will not be dismissed. See id. at *17–18 (holding that the plaintiffs sufficiently stated a claim that the owner-occupancy rates reported in the offering materials were materially false despite a disclaimer that the owner-occupancy information was "as reported by the mortgagor at the time of origination").

### 3. *Appraisals and LTV Ratios*

Capital Ventures alleges misstatements and omissions of material fact regarding the standards used for appraisals of the mortgaged properties and the resulting LTV ratios for the loans. Capital Ventures alleges that the Offering Materials contained "detailed statistics regarding the LTV ratios of the Mortgage Loans," Compl., D. 16 at ¶ 56, and "made factual representations regarding the process used to arrive at these figures." Compl., D. 16 at ¶ 57. For example, the Prospectus Supplement for AHMA 2006-2 represented that "[e]very American Home mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation." Compl., D. 16 at ¶ 57. Capital Ventures further alleges that the Defendants, originators and appraisers knew that the appraisal process was being manipulated. Compl., D. 16 at ¶ 59. The manipulation of the appraisal process rendered the representations regarding the appraisal process and the LTV ratios reported in the Offering Materials false and misleading. Compl., D. 16 at ¶ 59. In support of these allegations, Capital Ventures has presented "independent, statistically-derived valuation estimates" produced by an automated valuation model ("AVM"). Compl., D. 16 at ¶¶ 90–91. The AVM, according to Capital Ventures, was based on data similar to that used by in-person appraisers, including county assessor records, tax rolls and data on comparable properties. Compl., D. 16 at ¶ 91.

In response, the Defendants argue first that "the offering documents disclosed that LTV ratios and the appraisals on which they were based were <u>not</u> reliable estimates of value." Def. Mot., D. 14 at 20. For example, one prospectus supplement stated "that '[n]o assurance [could] be given that values of the mortgaged properties have remained or will remain at their levels on the dates of origination of the related mortgage loans' and that if property values fell, 'the rates of delinquencies, foreclosures and losses could be higher' than those experienced previously." Def. Mot., D. 14 at 14 (quoting AHMAT 2006-2 P.S. at S-15) (alterations in original).[4] The Defendants argue that these disclosures are fatal to Capital Ventures's claims based on the appraisal and LTV ratio statements.

The Court finds this argument unavailing because "warnings to the effect that some of the appraisals might be overstated or that property values might fluctuate . . . did not put Plaintiff on notice that the appraisers were <u>systematically</u> abandoning the represented appraisal procedures and understating LTV ratios." <u>Mass. Mutual</u>, 843 F. Supp. 2d at 203. The Offering Materials contained no disclosures warning of "a pattern and practice of . . . artificially increase[d] appraised values," as is alleged here. Compl., D. 16 at ¶ 148. Accordingly, the Offering Materials' disclosures cannot insulate the Defendants from liability for misstatements regarding the appraisal process and resulting LTV ratios.

Second, the Defendants contend that, even if the disclosures are insufficient to preclude liability, Capital Ventures's "claims that appraisals were overstated, resulting in understated LTV ratios, . . . further fail to state a claim because they are based on non-actionable third-party statements and opinions." Def. Mot., D. 14 at 22. This argument, however, overlooks the fact that, even if an appraisal is typically a non-actionable opinion, <u>see, e.g.</u>, <u>N.J. Carpenters Health</u>

---

[4] <u>See also</u> D. 15-2 at 30 (CWALT 2005-74T1); D. 15-3 at 35 (CWALT 2006-OA10); D. 15-5 at 33–34 (CWHL 2006-OA5); D. 15-7 at 21 (MARM 2004-13); D. 15-8 at 23 (MARM 2005-8).

Fund v. DLJ Mortg. Capital, Inc., No. 08 Civ. 5653, 2010 WL 1473288, at *8 (S.D.N.Y. Mar. 29, 2010), "[a] representation that certain specific standards will be used to generate appraisals is itself an actionable statement of fact." Mass. Mutual, 843 F. Supp. 2d at 203.  Here, the Offering Materials made factual representations about the processes the appraisers used to arrive at the appraisal values, such as following the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation.  Compl., D. 16 at ¶ 57.  Capital Ventures's allegation that such representations were inaccurate relies in part on the results of the AVM described above, which was based on data similar to that used by in-person appraisers.  Compl., D. 16 at ¶ 91.  The AVM's results suggested that "the properties were given a value that was inflated by more than 10% over 33% of the time, and the properties were given a value that was inflated by more than 25% over 9.7% of the time."  Compl., D. 16 at ¶ 94 (emphasis omitted).  Capital Ventures contends that "the consistent gap between [the Defendants'] representations and the values found by the AVM . . . [creates] the reasonable inference that the huge deviations arose because the appraisers did not follow the stated processes."  Pl. Opp., D. 17 at 26.  The Defendants respond that the AVM "at best, provides a second opinion as to the value of the mortgaged properties." Def. Mot., D. 14 at 23.  They thus argue that Capital Ventures is attempting to establish falsity "by pleading a different and purportedly more accurate opinion," Def. Mot., D. 14 at 25, which is ineffective.  See Nomura, 632 F.3d at 775.  But, in analysis that this Court finds persuasive, the Mass. Mutual court rejected this argument, concluding that the plaintiffs there — who relied on the same AVM used by Capital Ventures here — had plausibly alleged actionable misrepresentations regarding appraisals and the resulting LTV ratios by presenting the AVM results in combination with other allegations regarding appraisal practices.  See Mass. Mutual, 843 F. Supp. 2d at 203–04.  Capital Ventures has done the same here.  Thus, the Court concludes

that the Defendants' specific objections regarding the AVM's methodology "are premature at the motion to dismiss stage," id. at 204, and that Capital Ventures has alleged an actionable misrepresentation of fact by alleging that the Defendants misrepresented the standard used to generate appraisals.

Moreover, "[a]n opinion may still be misleading if it does not represent the actual belief of the person expressing the opinion, lacks any basis or knowingly omits undisclosed facts tending seriously to undermine the accuracy of the statement." Nomura, 632 F.3d at 775.  To the extent that Capital Ventures "brings a claim based on the inaccuracy of the appraisal values — as opposed to appraisal methodology used — [Capital Ventures] ha[s] pled facts supporting an inference that these appraisal 'opinions,' were not only objectively false, but also subjectively false" because Capital Ventures alleged that the appraisers did not believe their appraisals at the time they were given.  In re Bear Stearns Mortg. Pass-Through Certificates Litig., 851 F. Supp. 2d 746, 769 (S.D.N.Y. 2012); see Compl., D. 16 at ¶¶ 59 (alleging that "the originators, and the appraisers knew the appraisal process was being actively manipulated, so the originators could keep churning out loans to borrowers that could not afford them"); 99 (alleging that "[n]ot only were the appraisals used objectively false (as evidenced by the AVM data) but they were not subjectively believed, either.  The consistency and size of these misrepresentations confirms that the Defendants, the originators, and the appraisers knew that the appraisals being used were not reasonable indicators of the properties' value"); 100–103 (presenting testimony on appraisal manipulation given in connection with the government's investigation into the causes of the economic crisis); 118, 128, 146–49, 167–168, 171, 174 (allegations that the originators pressured appraisers to inflate appraisal values).  Accordingly, Capital Ventures has also alleged actionable

misrepresentations of opinion by pleading that the appraisal opinions were not subjectively believed at the time they were given.  See In re Bear Stearns, 851 F. Supp. 2d at 769–70.

       *4.*     *Credit Ratings*

Capital Ventures alleges misrepresentations regarding the credit ratings process.  Compl., D. 16 at ¶¶ 60–63.  The Offering Materials set forth the ratings for each class of Certificate issued, based on ratings analyses done by the credit rating agencies.  Compl., D. 16 at ¶ 61.  "Each tranche of the Certificates received a credit rating indicating the rating agencies' view of its risk profile."  Compl., D. 16 at ¶ 60.  For example, the Offering Materials for CWALT 2006-OA10 represented that the ratings Moody's assigned to the Certificates reflected the likelihood that the investor would receive all distributions on the underlying loans and took into consideration the credit quality of the underlying loan pool.  Compl., D. 16 at ¶ 62.  Capital Ventures does not allege that the ratings given were misreported, but rather that these ratings were false and misleading because they were based on "false and misleading data regarding, among other things, the property's occupancy status and value, and regarding the underwriting processes applied to that loan."  Compl., D. 16 at ¶ 178.  Therefore, the "Defendants' representations that the given ratings would reflect the rating agencies' view of these Certificates were false.  To the contrary, the ratings reflected, at best, the agencies' view as to the creditworthiness of a hypothetical security Capital Ventures was promised, but did not receive."  Compl., D. 16 at ¶ 178 (emphasis in original).

The Defendants argue that, like appraisals, "credit ratings are non-actionable third-party statements of opinion" and therefore, Capital Ventures's "ratings claims must be dismissed because [Capital Ventures] fails to allege that the ratings assigned to its Certificates were not believed by the ratings agencies when issued or that the Defendants misreported the ratings

actually given." Def. Mot., D. 14 at 27. "The ratings are <u>opinions</u> purportedly expressing the agencies' professional judgment about the value and prospects of the certificates" and, as discussed above, "may . . . be misleading if [they do] not represent the actual belief of the person expressing the opinion[s], lack[] any basis or knowingly omit[] undisclosed facts tending seriously to undermine the accuracy of the statement[s]." <u>Nomura</u>, 632 F.3d at 775. In <u>Nomura</u>, the First Circuit dismissed plaintiffs' claims that the credit ratings were based on "inaccurate information," which are substantially similar to Capital Ventures's claims,[5] because "the complaint stop[ped] short of alleging expressly that the leadership of S & P or Moody's believed that their companies' ratings were false or were unsupported by models that generally captured the quality of the securities being rated." <u>Id.</u> Accordingly, Capital Ventures has failed to plead a claim based on the theory that the credit rating agencies disbelieved their ratings.

---

[5]     The <u>Nomura</u> plaintiffs alleged the following:

> In addition to the eroding rating standards and the flawed rating models described above, Moody's and S & P's ratings were based on inaccurate information. The rating agencies rated the Certificates based in large part on data about each of the mortgage loans that Nomura provided to them — including appraisal values, LTV ratios, and borrower creditworthiness and the amount of documentation provided by borrowers to verify their assets and/or income levels. As discussed above, much of this data was inaccurate due to the inflated appraisal values, inaccurate LTV ratios, borrower income inflation, and the other facets of defective underwriting addressed in this Complaint. Neither Moody's nor S & P engaged in any due diligence or otherwise sought to verify the accuracy or quality of the loan data underlying the RMBS pools they rated (and specifically disclaimed any due diligence responsibilities).

Consolidated Amended Complaint at ¶ 165, <u>Nomura</u>, 632 F.3d 762 (No. 08-cv-10446).

> Because Moody's and S & P were using flawed information and models to generate their ratings, the ratings assigned to the Certificates did not accurately reflect their risk, and Certificates were given investment grade ratings when in reality they were not of investment grade quality. As such, the statements regarding the ratings of the Certificates were false and misleading.

<u>Id.</u> at ¶ 167.

Capital Ventures attempts to distinguish <u>Nomura</u> and argues that the Defendants could not reasonably have believed that the ratings were accurate because "those involved in the [s]ecuritizations . . . fed garbage data to the agencies, an issue of fact well discernible to [the Defendants]."  Pl. Opp., D. 17 at 34.  Capital Ventures alleged that due to being fed "garbage," the Defendants' representations that the given ratings would reflect the rating agencies['] view of the Certificates were false.  Compl., D. 16 at ¶ 178.

<u>In re Bear Stearns</u> considered a similar claim wherein the plaintiffs argued that the defendants "could not reasonably have believed that the ratings [contained in the offering documents] were accurate because 'the information [the defendant] provided to the Rating Agencies regarding the loans underlying the pools at issue was faulty and inaccurate.'"  851 F. Supp. 2d at 771.  There, the complaint alleged that prior to making bulk purchases of mortgages from originators, the defendant gave detailed information about the mortgages to rating agencies so that they could run the information through their models and determine the appropriate bid the defendant should offer to the originators for the mortgage pool.  <u>Id.</u> at 771–72.  Once the bid was accepted by the originators, the defendant retained a due diligence firm to conduct a more thorough review of the pool, and at this point discovered that the loans were missing critical documentation or failed to comply with underwriting standards.  <u>Id.</u> at 772.  The court explained that the plaintiffs' claim had some merit, but was unavailing because the complaint was missing some "crucial" information such as "at what stage the Agencies rated the Certificates" and "what information the Agencies relied upon to arrive at those ratings."  <u>Id.</u>  The court concluded that the defendant could not have reasonably believed that the ratings accurately reflected the Certificates' risk if the defendant either supplied the ratings agencies with inaccurate information about the mortgages or discovered that the rating agencies' produced ratings based on inaccurate

information.  Id.  Accordingly, if such were the case, the unqualified representation in the offering documents that the ratings reflected the Certificates' risk would be an actionable misrepresentation and omission.  Id.

Far less is alleged here; Capital Ventures merely alleges that the rating agencies issued ratings "based on the loan profiles fed to the agencies, which included false and misleading data regarding, among other things, the property's occupancy status and value, and regarding the underwriting processes applied to that loan."  Compl., D. 16 at ¶ 178.  Therefore, Capital Ventures does not sufficiently allege that that the "ratings' unqualified reproduction in the Offering [Materials] would constitute an actionable misrepresentation and omission."[6]  In re Bear Stearns, 851 F. Supp. 2d at 772.  Accordingly, Capital Ventures's claims relating to misrepresentations regarding the credit ratings will be dismissed without prejudice.[7]

### B.    Failure to Plead Materiality

To state a claim under section 410(a) of the MUSA, a plaintiff must allege that the information it claims was misstated or misleading was material.  Mass. Gen. L. c. 110A, § 410(a).  "Materiality is an 'inherently fact-specific finding.'"  Litwin v. Blackstone Grp., 634

---

[6] The Defendants argue that the allegation that the ratings were not based upon information that reasonably related to the loans underlying the Certificates fails to state a claim because "the offering documents explicitly warned investors about the risks of relying on credit ratings."  Def. Reply, D. 18 at 13; see e.g., D. 15-1 at 18 ("The ratings of the offered certificates by the rating agencies may be lowered following the initial issuance thereof as a result of losses on the related mortgage loans in excess of the levels contemplated by the rating agencies at the time of their initial rating analysis").  However, this argument is unavailing because the "boilerplate disclaimers" warned Capital Ventures of the risk of downgrades based upon unforeseen events in the future, but did not disclose that the ratings were compromised due to the ratings agencies' past reliance on inaccurate information.  In re Bear Stearns, 851 F. Supp. 2d at 772 n.30.

[7] Capital Ventures has requested leave to amend its complaint as to its claim regarding the credit rating to make clear that the Defendants did not reasonably believe the ratings made by the ratings agencies based upon information such as the LTV ratios and owner-occupancy statistics.  Pl. Opp., D. 17 at 34 n. 14.  Since the Court cannot conclude that such amendment would be futile, the Court dismisses this claim without prejudice to allow Capital Ventures to amend as to this claim.

F.3d 706, 716 (2d Cir. 2010) (quoting <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 236 (1988)). Whether a statement or omission is material is an objective question:  "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." <u>Marram</u>, 442 Mass. at 57–58 (2004) (quoting <u>Craftmatic Sec. Litig. v. Kraftsow</u>, 890 F.2d 628, 641 (3d Cir. 1989)) (internal quotation marks omitted).  Here, the Defendants assert that "in light of (1) the extensive offering document disclosures about risks of borrower fraud and inaccuracies arising from the origination process and (2) the wealth of information that was in the public domain on these issues before [Capital Ventures] purchased its Certificates," Capital Ventures has failed to plead materiality.  Def. Opp., D. 14 at 31.  Although materiality may be decided as a matter of law on a motion to dismiss, <u>see, e.g.</u>, <u>Glassman v. Computervision Corp.</u>, 90 F.3d 617, 631–33 (1st Cir. 1996), a complaint may not be properly dismissed on the ground that the alleged misstatements or omissions are not material unless they "are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality."  <u>Marram</u>, 442 Mass. at 58 (citation omitted); <u>see also</u> <u>Litwin</u>, 634 F.3d at 717.  In light of the allegations in this case – namely, that misstatements or omissions regarding underwriting standards, owner-occupancy statistics, appraisal standards and resulting LTV ratios, and credit ratings are material because they are all indicative of the quality and nature of Capital Ventures' investment – the Court cannot reach such a conclusion.  Accordingly, the claims will not be dismissed on this basis.

### C.    <u>Statute of Limitations</u>

Claims under MUSA section 410(a) are subject to a four-year statute of limitations that runs from the date of "the discovery by the person bringing the action of a violation" of the Act. Mass. Gen. Laws c. 110A, § 410(e); <u>see</u> <u>Mass. Mutual</u>, 843 F. Supp. 2d at 208.   Here, the

Defendants aver that this period has lapsed because Capital Ventures was on "inquiry notice" of the claims presented in the complaint before November 1, 2007, i.e., more than four years before the complaint was filed on November 1, 2011.  Def. Mot., D. 14 at 32.  The Defendants' inquiry-notice argument relies on numerous public media reports and a pair of lawsuits, all dated between 2003 and 2007.  See Def. Mot., D. 14 at 34–36.

Where, as here, a defendant contends that "storm warnings" triggered the statute of limitations period, "the defendant bears the initial burden of establishing the existence of such warnings."  Young v. Lepone, 305 F.3d 1, 9 (1st Cir. 2002).  The limitations period does not begin upon the appearance of the warnings but rather at "the later date on which an investor, alerted by storm warnings and thereafter exercising reasonable diligence, would have discovered the fraud."  Id.; see also Merck & Co. v. Reynolds, — U.S. —, 130 S. Ct. 1784, 1798 (2010) (limitations period begins to run under the Exchange Act when a reasonably diligent plaintiff would have discovered the facts constituting the violation); In re Bear Stearns, 851 F. Supp. 2d at 762–63 (noting that Merck's "invalidation of the inquiry notice standard for '34 Act claims extends to claims brought under Sections 11 and 12(a)(2) of the '33 Act" and explaining that the relevant question for statute of limitations purposes is "whether a plaintiff could have pled '33 Act claims with sufficient particularity to survive a 12(b)(6) motion to dismiss").  Typically, whether and when such warnings were apparent is a question for the factfinder.  See Young, 305 F.3d at 9 (citing Marks v. CDW Computer Ctrs., Inc., 122 F.3d 363, 368–69 (7th Cir. 1997)).  Thus, a claim will be dismissed on the pleadings only when there is "no doubt that [it] is time-barred."  Warren Freedenfeld Assocs. v. McTigue, 531 F.3d 38, 46 (1st Cir. 2008) (citation omitted).

The Defendants' showing does not meet this demanding standard.  To begin with, most of the sources upon which the Defendants rely are not specific to the parties here, but rather deal with the mortgage industry generally.  Def. Mot., D. 14 at 34–36; see Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Group, Inc., No. 09 CV 1110 (HB), 2011 WL 135821, at *9 (S.D.N.Y. Jan. 12, 2011) (declining to dismiss claims as time-barred where public information identified by defendant "d[id] not 'relate directly' to the misrepresentations and omissions alleged" in the complaint).  Those sources cited by the Defendants that do "discuss[] the allegedly poor or improper underwriting and appraisal practices of the specific originators of the underlying loans," Def. Mot., D. 14 at 36 – along with the delinquency and default rates contemporaneously available to Capital Ventures – are at most sufficient to show that a reasonably prudent investor would have begun investigating the issues raised in the complaint by late 2007; they do not establish that such an investor would have, by that time, discovered the facts constituting the violations themselves.  See Young, 305 F.3d at 9 (noting that "a reasonably diligent investigation . . . may consume as little as a few days or as much as a few years to get to the bottom of the matter"), cited with approval by Merck & Co., 130 S. Ct. at 1798.  Finally, "courts have been reluctant to conclude that purchasers of mortgage-backed securities were on inquiry notice of similar claims as late as mid-2008, let alone as early as 2007."  Mass. Mutual, 843 F. Supp. 2d at 208–209 (citing In re IndyMac Mortg.-Backed Sec. Litig., 718 F. Supp. 2d 495, 505 (S.D.N.Y. 2010); Pub. Emps.' Ret. Sys., 2011 WL 135821, at *8–9).  In light of the foregoing, the Court cannot conclude that there is "no doubt" that these claims are time-barred; accordingly, the Court declines to dismiss them on this basis.  Warren Freedenfeld Assocs., 531 F.3d at 46.

### D.     The Non-Underwriter Defendants are Not Sellers

To be liable under section 410(a), the Defendants must have offered or sold securities. Mass. Gen. L. c. 110A, § 410(a)(2).  The Defendants argue that UBS Real Estate, MASTR and the trusts, those entities that did not sell the Certificates directly to Capital Ventures, are not sellers and thus Capital Ventures's claims against UBS Real Estate and MASTR, arising out of the purchase in the MARM offerings, must be dismissed.  Def. Mot., D. 14 at 37.

Liability as a seller or offeror under section 410(a), like liability under Section 12 of the Securities Act of 1933, extends not only to those who directly transfer title of the securities to the plaintiff-purchasers, but also "to the person who successfully solicits the purchase [of the Certificates] motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  Pinter v. Dahl, 486 U.S. 622, 643, 647 (1988).  The parties do not dispute that the trusts, UBS Real Estate and MASTR did not directly transfer title of the Certificates to Capital Ventures.[8]  Therefore, to be primarily liable under MUSA section 410(a), these entities must have "successfully solicited" Capital Ventures's purchase of the Certificates to further their own financial interests.  Although Capital Ventures alleges in its complaint that the "sponsor, depositor, underwriter, and trusts successfully solicited" Capital Ventures's purchases and "profited from the sales," Compl., D. 16 at ¶¶ 180–184,  such a conclusory allegation is insufficient to defeat a motion to dismiss.  Shaw, 82 F.3d at 1216.

More specifically, Capital Ventures alleges that UBS Real Estate, as the sponsor for the MARM Offerings, "acquired the mortgage loans that were pooled together in the securitizations, and then sold, transferred, or otherwise conveyed title to those loans to the depositor."  Compl., D. 16 at ¶ 180.  MASTR, as depositor of the MARM Offerings, "purchased the mortgage loans

---

[8] Capital Ventures alleges that "UBS Securities was the direct counterparty from whom Capital Ventures purchased all of the Certificates at issue here."  Compl., D. 16 at ¶ 9.

from the sponsor," "sold, transferred, or otherwise conveyed the mortgage loans to the trusts, which held the loans as collateral for the Certificates" and "was responsible for registering the offerings with the SEC." Compl., D. 16 at ¶ 181. Capital Ventures alleges that both UBS Real Estate and MASTR "shared responsibility for preparing the Offering Materials that were used to solicit purchases of the Certificates" and were "identified on the Prospectuses and Prospectus Supplements." Compl., D. 16 at ¶¶ 180–181. "The trusts issued the Certificates that were sold to investors" and "had no autonomy or assets of their own, but were agents of the depositors created for the sole purposes of holding the pools of mortgage loans assembled by the sponsor and depositor and issuing the Certificates for sale to the investors." Compl., D. 16 at ¶ 182. UBS Securities "was responsible for underwriting and managing the sale of Certificates." Compl., D. 16 at ¶ 185.

"The relevant inquiry for seller liability is the 'defendant's relationship with the plaintiff-purchaser,' not 'the defendant's degree of involvement in the securities transaction and its surrounding circumstances.'" Mass. Mutual, 843 F. Supp. 2d at 206 (quoting Pinter, 486 U.S. at 651). The complaint's allegations establish UBS Real Estate, MASTR and the trusts' involvement in the securitization, rather than their direct involvement in the sale of the Certificates to the purchaser, Capital Ventures. See Shaw, 82 F.3d at 1215 (noting that a defendant must be "directly involved in the actual solicitation of a securities purchase in order to qualify, on that basis, as a Section 12 'seller'"); Me. State Ret. Sys. v. Countrywide Fin. Corp., No. 2:10-CV-0302 MRP, 2011 WL 4389689, at *9 (C.D. Cal. May 5, 2011) (noting that "[t]o sustain a Section 12(a)(2) claim against the Issuer Defendants under the second prong of the Pinter test, seller by solicitation, Plaintiffs would have to plead active participation in the solicitation of the immediate sale, a direct relationship between the purchaser and the

defendant"); Mass. Mutual, 843 F. Supp. 2d at 206.   Capital Ventures argues that these "affiliated entities worked together on many similar offerings" and that "these offerings were just a few in a series operated by a single joint enterprise [that] gave each entity a keen interest in the transaction's overall success that did not stop once their strict contractual role was fulfilled."  Pl. Opp., D. 17 at 41.   However, these arguments are inapposite because, while they may establish that these entities were "motivated at least in part by a desire to serve [their] own financial interests," they do not establish that the entities "solicited" the purchase of the securities; under Pinter, it is not enough that an entity was a "'substantial factor' in causing the sale of [] securities."  Pinter, 486 U.S. at 654.[9]

Accordingly, Capital Ventures's section 410(a) claims against UBS Real Estate and MASTR will be dismissed.

### E.     Failure to Plead "Control Person" Liability

Section 410(b) provides for joint and several liability for persons who directly or indirectly controls a seller liable under section 410(a).  Mass. Gen. L. c. 110A, § 410(b).  Capital Ventures argues that "[b]ecause UBS Real Estate controlled MASTR, and because these defendants both controlled the trusts, these defendants are also liable as control persons under

---

[9] Capital Ventures makes two additional arguments with regard to MASTR qualifying as a seller. First, Capital Ventures argues that MASTR, as the depositor, is the issuer of the securities under section 2(a)(4) of the Securities Act of 1933, which states, "with respect to certificates of interest or shares in an unincorporated investment trust not having a board of directors . . . the term 'issuer' means the person or persons performing the acts and assuming the duties of depositor." 15 U.S.C. § 77b(4).  Capital Ventures then relies upon SEC Rule 159A, which provides that an issuer is a seller of securities for purposes of section 12(a)(2) of the Securities Act of 1933, 17 C.F.R. § 230.159A, to argue that MASTR is a seller under MUSA.  Pl. Opp., D. 17 at 40. However, the Court finds Mass. Mutual's  conclusion that "while an SEC regulation is . . . entitled to consideration, it cannot countermand" Pinter, a "contrary Supreme Court holding" more persuasive.  Mass. Mutual, 843 F. Supp. 2d at 207.  Second, Capital Ventures points out that Nomura upheld a "seller" claim against a depositor.  Pl. Opp., D. 17 at 42.  However, "neither the district court nor the First Circuit in Nomura considered the question of what constitutes 'solicitation' of securities purchases."  Mass. Mutual, 843 F. Supp. 2d at 206 n.9.

Section 410(b)." Pl. Opp., D. 17 at 43. For "control person" liability to attach, Capital Ventures must allege (1) an underlying violation by the controlled entity, and (2) that the "control person" controlled the violator. In re Evergreen Ultra Short Opportunities Fund Sec. Litig., 705 F. Supp. 2d 86, 96 (D. Mass. 2010). Here, for UBS Real Estate to be liable as a control person, Capital Ventures must establish (1) that MASTR and/or the trusts are primarily liable under section 410(a) and (2) that UBS Real Estate controlled MASTR and/or the trusts. For MASTR to be liable as a control person, Capital Ventures must establish (1) that the trusts are primarily liable under section 410(a) and (2) that MASTR controlled the trusts. To establish control, Capital Ventures must show that UBS Real Estate and MASTR "not only have the general power to control [the entity], but must also actually exercise control over the [the entity]." Aldridge v. A.T. Cross Corp., 284 F.3d 72, 85 (1st Cir. 2002). The success of a claim under section 410(b) relies, in part, on Capital Ventures's ability to demonstrate MASTR's and the trusts' primary liability under section 410(a). See In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010). For the reasons discussed above, Capital Ventures has not adequately pled primary violations by MASTR and the trusts. Because MASTR and the trusts are not primarily liable under MUSA as statutory sellers, the section 410(b) claims against MASTR and UBS Real Estate will be dismissed.

## V.    Conclusion

For the foregoing reasons, the Defendants' motion to dismiss is GRANTED in part and DENIED in part. The Defendants' motion to dismiss is DENIED as to the allegations regarding underwriting guidelines, owner-occupancy rates, appraisals and LTV ratios. The Defendants' motion to dismiss is GRANTED without prejudice as to Capital Ventures' credit ratings claim and Capital Ventures may amend its pleading as to this claim within fifteen days of this Order.

The Defendants' motion to dismiss is GRANTED as to Capital Ventures' section 410(a) and (b) claims against UBS Real Estate and MASTR.

**So ordered.**

/s/ Denise J. Casper
United States District Judge